UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03CV-737-H

KHADRA MOHAMED-SHEIK and
FARHIYO HERSI                                                                           PLAINTIFFS

V.

GOLDEN FOODS/GOLDEN BRANDS LLC                                         DEFENDANT

**MEMORANDUM OPINION**

Plaintiffs Farhiyo Hersi ("Hersi") and Khadra Mohamed-Sheik ("Mohamed") filed suit against their former employer, Defendant Golden Foods/Golden Brands LLC ("Golden Brands"), alleging religious discrimination based on a failure to accommodate in violation of 42 U.S.C. § 2000e-2 and Ky. Rev. Stat. Ann. § 344.040(1). Golden Brands has moved for summary judgment on Plaintiffs' claims.

I.

Hersi and Mohamed, both observant Muslims, are refugees from Somalia who began working on the manufacturing floor for Golden Brands in July 2000 and May 2001, respectively. Golden Foods manufactures edible liquid oil and sends it to Golden Brands for packaging or conversion to flake form shortening. The flake product is packaged at Golden Brands and purchased by customers such as Pillsbury for inclusion in their products. Golden Brands' uniform consisted of a uniform shirt with buttons or pockets, tucked into pants, closed-toed shoes, no jewelry, and a hairnet while in the production area. Head scarves were permitted to be worn underneath an employee's hairnet. Hersi claims that when she began her employment with

Golden Brands, she explained to Mary Lou Dearner ("Dearner"), the company's Human Resources Manager, that her religious beliefs precluded her from dressing like a man or wearing clothing that revealed the female shape, and that she was required to wear a head scarf. In response, Golden Brands provided Hersi with a long-sleeved, extra-large, extra-long shirt to wear. Golden Brands also provided an extra-large shirt to Mohamed when she was hired. Golden Brands claims that it provided the extra-large shirts in order to allow the Plaintiffs to tuck in the ends and "blouse out" the remainder of the shirts, thereby concealing their waistlines. However, Plaintiffs claim, and Defendants do not dispute, that in practice they wore the shirts untucked, creating an appearance similar to that of a tunic over pants. When the shirts are tucked in and bloused, the bloused portion of the shirt extends to somewhere between mid-thigh and slightly below the knee. Prior to February 19, 2002, Plaintiffs were never disciplined for wearing their shirts untucked.

At some point after September 11, 2001, a number of events occurred. Plaintiffs allege that Dearner told them on several occasions not to pray during work breaks, even though Plaintiffs' religious duties required them to pray several times each day and Golden Brands' employees are permitted to use their break time as they choose. Plaintiffs also claim that Dearner told them not to wear their Head scarves, and not to speak Somali. On February 19, 2002, Plaintiffs' supervisor, Mahammad Hassan ("Hassan") told them that Dearner had imposed a new rule requiring them to tuck in their shirts. Following the conversation with Hassan, Plaintiffs met with Dearner, who told them to tuck in their shirts. Plaintiffs indicated that they could not do so without violating their religious beliefs. Dearner told Plaintiffs that they must tuck in their shirts or leave. Hersi asked whether she and Mohamed could finish their shifts, and

Dearner said no. Plaintiffs left work and did not return. Golden Brands' policy was that an employees who did not report for work for three consecutive would be terminated. Although there is debate about whether Plaintiffs voluntarily resigned or were constructively discharged, Golden Brands concedes that Plaintiffs would not have been permitted to return to work unless they tucked in their shirts, rendering the distinction immaterial for purposes of this opinion.

Following these events, Plaintiffs received a right to sue letter from the Equal Employment Opportunity Commission and filed suit against Golden Brands for religious discrimination based on failure to accommodate and national origin discrimination. Plaintiffs appear to have abandoned their claims for national origin discrimination; accordingly, the Court will address only the accommodation claim.

II.

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party "must establish that there are no genuine issues of material fact and that the evidence, when read in the light most favorable to the nonmoving party, compels a ruling in favor of the moving party." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999).

III.

Title VII of the Civil Rights Act of 1964,[1] as amended in 1972, bars "discriminat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2; *Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 633 (6th Cir. 2003). "Religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Virts v. Consolidated Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002). Therefore, an employer has a duty to provide a reasonable accommodation for employees who request one unless it can demonstrate that to do so causes an undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68-69 (1986).

To establish a prima facie case of religious discrimination, Plaintiffs must prove the following three elements: (1) they hold a sincere religious belief that conflicts with an employment requirement; (2) they informed Golden Brands of the conflict; and (3) they were discharged or disciplined to failing to comply with the employment requirement. *Goldmeier*, 337 F.3d at 633 (citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994)). Once Plaintiffs establish a prima facie case, Golden Brands must prove that either (1) it offered a reasonable accommodation which Hersi and Mohamed rejected, or (2) it was unable to provide a reasonable accommodation without undue hardship. *Ansonia Bd. of Educ.*, 479 U.S. at 68-69.

---

[1] KRS Chapter 344 parallels Title VII; accordingly, the Court will analyze the state law accommodation claim under federal law. Ky. Rev. Stat. Ann. § 344.040(1); *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1250 (6th Cir. 1995)(citing *Harker v. Federal Land Bank of Kentucky*, 679 S.W.2d 226, 229 (Ky. 1984)).

4

The reasonableness of Golden Brands' accommodation attempts, if any, is determined on a case-by-case basis. *Virts*, 285 F.3d at 516 (quoting *Cooper*, 15 F.3d at 1378).

Plaintiffs have established a prima facie case. Each has testified that her religious dictates prohibit her from dressing like a man or wearing clothing that reveals the female shape,[2] and Golden Brands concedes that they were informed of the conflict between Plaintiffs' religious beliefs and the Golden Brands uniform policy. Plaintiffs told Dearner of their religious beliefs and their inability to wear form-fitting, tucked-in shirts both when they were hired and again when Dearner told them they must tuck in their shirts. In addition, although Plaintiffs were not formally disciplined or terminated as a result of violating the tuck in policy, Golden Brands concedes that it would not have permitted either to return to work unless they tucked in their shirts.

Thus, Golden Brands must prove either that it offered Plaintiffs a reasonable accommodation that they rejected or that no accommodation is possible without undue hardship to the company's business. In this case, it appears that the only accommodation that Plaintiffs would deem acceptable is an untucked extra-long shirt. Golden Brands argues that no accommodation involving an untucked shirt is possible without undue hardship to its business, because safety would be compromised. The undue hardship standard requires only a showing by Golden Brands that the hardship on its business would be more than *de minimis*. *Trans World*

---

[2] Although Golden Brands argues that Hersi conceded in her deposition that she could depart from her religious dictates to prevent injury to herself and that accordingly she could wear the extra-long shirt tucked in, the testimony establishes otherwise. In her deposition, Hersi stated that she could depart from her religious requirements if there was a potential for bodily harm: "harm of my life, it's okay." She also stated ". . . I said whatever my religion requires to be done, I will do. And also, I will not do anything which will harm my life." Hersi Dep. at 40-42. These statements do not establish that Hersi does not sincerely believe that a tucked-in shirt violates her religion.

*Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). Golden Brands argues that the uniform policy exists primarily to minimize exposure to bodily harm – to prevent loose ends from becoming entangled in conveyors, sprockets, drive belts, and similar equipment. In support of its claim that permitting untucked shirts would be a safety concern, Golden Brands offers the testimony of Edward Hitch ("Hitch"), a consultant to Golden Brands.[3] Hitch was retained by Golden Brands to inspect employees for compliance with the company's Personal Sanitation Rules (including the uniform policy) and to ensure the company's compliance with the American Institute of Baking's ("AIB") consolidated standards for food safety, as well as Good Manufacturing Practices ("GMPs").[4] Prior to starting his own business as a food safety consultant, Hitch worked as a field inspector/auditor for the AIB. Hitch testified in his deposition that untucked shirttails were potentially hazardous because they could get caught in moving machinery, potentially causing injury to life or limb. In addition, a loose shirttail could rip and become a contaminant in the food product if it were to get caught in the machinery. Hitch further testified that compliance with the AIB standards and GMPs was critical to Golden Brands because its customers would evaluate the company based on these standards. Golden Brands claims that it could lose customers if it received a poor AIB rating. Hitch also testified that, based on his experience, a tuck in policy is fairly common in the manufacturing industry.

    Cases within the Sixth Circuit and other jurisdictions establish that an employer is not

---

[3] Although Plaintiffs argue that Hitch's testimony is improper expert testimony, the Court disagrees. Hitch was a consultant to Golden Brands, and the testimony referred to above is based on his direct personal knowledge and experience. There is therefore no violation of Fed. R. Evid. 701, which permits a lay witness to offer opinions when predicated on the experience or perception of the individual.

[4] GMPs, which codify good manufacturing practices in the food industry, are contained in the Code of Federal Regulations. Although Golden Brands does not cite to a specific provision of the GMPs upon which its tuck in policy is modeled, the Court assumes for purposes of this opinion that such a provision exists.

required to accommodate a religious concern when doing so would potentially create a safety risk to its employees or a legal risk for the employer. *See, e.g., Draper v. United States Pipe and Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1976) ("safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on an employer's business"); *Killebrew v. Local Union 1683 of American Federation of State, etc.* 651 F. Supp. 95 (W.D. Ky. 1986) (in determining whether union was required to vary its collective bargaining agreement to accommodate employee's desire to switch to a job where she could wear skirt instead of pants, implicitly finding that employer not required to permit employee to wear skirt in manufacturing facility); *EEOC v. Oak-Rite Mfg. Co.*, 2001 WL 1168156 (S.D. Ind. 2001) (court rejected employee's argument that she should be permitted to wear ankle length skirt instead of pants in manufacturing plant where the employer stated such skirt would present a safety hazard; court stated that employer is not required to prove conclusively that employee would be injured by permitting employee's proposed accommodation); *EEOC v. Heil-Quaker Corp.*, 1990 WL 58543 (M.D. Tenn. 1990) (it would be an undue hardship for employer to permit employee to wear skirt instead of pants in its manufacturing plant because safety would be compromised); *Kalsi v. New York City Transit Authority*, 62 F.Supp.2d 745, 760 (S.D.N.Y. 1998), *aff'd mem.*, 189 F.3d 461 (2d Cir. 1999) (court upheld employer's rejection of employee's request to be permitted to work with some modifications without a hard hat where company safety regulations required a hard hat, stating that "Title VII does not require employers to absorb the cost of all less than catastrophic physical injuries to their employees in order to accommodate religious practices"); *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383-84 (9th Cir. 1984) (employer did not have to accommodate employee's request that he be permitted to

7

wear a beard where company had legitimate safety concern that beard would prevent airtight seal of mask in the event of exposure to toxic gas and allowing beard would expose company to potential liability under California safety regulations).

In addition, the fact that Golden Brands has not always enforced its tuck in policy does not mean that it may not later adopt and enforce regulations designed to enhance safety at its facility. For example, in *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 135-36 (1st Cir. 2004), the employer implemented a grooming policy that forbade employees from wearing facial jewelry, in order to maintain a professional appearance. Although Plaintiff had worked at Costco prior to the implementation of the grooming policy, and although the policy was not immediately enforced, the court found that to require Costco to accommodate the employee's desire to wear facial jewelry would present an undue hardship because Costco had a legitimate interest in maintaining a professional appearance in its employees.

If there were no other evidence by the Plaintiffs in this case regarding the tuck in policy, the undue hardship on Golden Brands would seem to be clear. However, such is not the case here. Plaintiffs essentially allege that, following September 11, 2001, Golden Brands became uncomfortable with Hersi and Mohamed because of their religion and exhibited this discomfort through Dearner's arguably hostile comments to the Plaintiffs regarding praying at work, Head scarves, and speaking their native language. It was Dearner who apparently made the decision to begin enforcing the tuck in policy at Golden Brands, and there is no evidence that the policy had been enforced, at least as to the Plaintiffs, prior to February 19, 2002. Golden Brands rightfully points out that it would be problematic to hold that an employer could not reevaluate its existing practices and seek to improve them by enforcing stricter safety measures. However, the Court

8

does not so hold in this instance.  Rather, the Court holds that there are significant material facts in dispute, namely, whether allowing an accommodation to the tuck in policy would in fact present an undue hardship to Golden Brands where there is evidence that safety concerns may not have been the exclusive, or even the primary factor behind the enforcement of the policy.  Accordingly, Defendant's motion for summary judgment is denied.

    The Court will enter an order consistent with this memorandum opinion.

cc:    Counsel of Record